**SMITH, et ux v. TAMPA ELECTRIC CO., et al.**
No. 75-468.
Circuit Court, Hillsborough County.
December 8, 1977.

I. W. Williams and Morris Milton, both of St. Petersburg, for the plaintiffs.

Timothy F. Prugh of Shackleford, Farrior, Stallings & Evans, Tampa, for the defendants.

ROBERT W. PATTON, Circuit Judge.

This cause came on to be heard before the court on June 30th, 1977 upon the following motions filed by the defendants Tampa Electric Company and Globe Indemnity Company —motion for new trial, motion for judgment notwithstanding verdict and motion for remittitur. There were present at the hearing Timothy F. Prugh, Esq., of Shackleford, Farrior, Stallings & Evans, attorneys for the defendants, and I. W. Williams, Esq., and Morris Milton, Esq., attorneys for the plaintiffs, John A. Smith and Mary Smith, his wife.

The court has considered the motions and the arguments of counsel with respect thereto and also the memorandums which they have filed in the cause subsequent to the hearing at the request of the court.

This was an action for personal injuries suffered by the co-plaintiff John A. Smith (hereafter referred to as "the plaintiff" or "Smith") while he was employed by Cone Brothers Contracting Company, which was a subcontractor on a highway construction project in Hillsborough County. Mary Smith, the other plaintiff in the action, claimed derivative damages as the result of the injuries to her husband, John A. Smith. The injuries suffered by Smith resulted from an electrical charge passing through a mobile crane, or some part thereof, which was being operated by another employee of Cone Brothers Contracting Company at the time. There was sufficient evidence, in the opinion of this court, from which the jury in this case could determine that the electrical charge above mentioned came from uninsulated power lines of the defendant Tampa Electric Company located in the immediate vicinity of the crane. The evidence further reveals that approximately 7,600 volt current was being transmitted over the power lines at the time of the accident.

The power lines in question were of a temporary nature and had been erected by Tampa Electric Company over an area in which that company knew, or had reason to know, that construction work on a bridge immediately adjacent to the power line was either then taking place or about to take place. It is the opinion of the court that there was ample evidence from which the jury could determine that Tampa Electric Company knew, or had reason to know, that construction equipment such as cranes would be in use in the area adjacent to the power line.

The accident happened in an area lying between the bridge on the east and a temporary road on the west. The land between the road and bridge was approximately 90 feet wide. The bridge and the temporary road both ran in a generally north and south direction. The power line also ran along the east side of the road and in the same general direction.

On the morning of the accident a mobile crane had been brought onto the strip of land between the temporary road and the bridge under construction. Previous to that time Cone Brothers Conracting Company had caused a number of bundles of steel to be placed on the aforesaid strip of land, same having been located either underneath the east edge of the electric line or very close thereto. The purpose of bringing the crane into that location on the morning in question was so that it would be used to move the bundles of steel from the positions in which they were then located a distance of some 20 to 25 feet to the east. The steel was to be used in the construction of the bridge.

On the morning in question the plaintiff, whose usual job was cement finishing, was directed by his foreman to select a fellow employee in order that the two of them could work in conjunction with the crane operator, also an employee of Cone Brothers Contracting Company, in moving the bundles of steel. The first task to which the plaintiff was assigned was to assist the crane operator in moving the crane to a position from which it could be used to move the steel. The crane was a self-propelled vehicle having two separate cabs. One of the cabs was used for the purpose of driving the vehicular part of the crane, and it was into this cab that the plaintiff was directed to go in order to drive said vehicle to the proper position. The plaintiff did so drive said vehicle under the direction of the crane operator to the location which the latter had selected for the crane to be placed for the purpose of moving the steel. There was testimony that after the crane had been so placed the boom thereof was 4 to 7 feet east of the electric line.

The crane had a boom 35 to 45 feet or more in length and the boom could be moved both from side to side and up and down. There was evidence that the top of the boom was higher than the electric wires. The crane was operated from the cab above mentioned and the operator testified that in moving the boom from side to side he was able to lock same when he stopped this operation, thus rendering it impossible to move the boom until such brake was released.

As part of his duties on the morning in question, the plaintiff was assigned the responsibility of signalling the crane operator when the boom of the crane should be stopped as it was moved

toward the west for the purpose of picking up a load of steel. This was done by means of hand signals, and Smith and the crane operator had agreed on a point where the boom was 4 to 6 feet distant from the closest wire as the place to stop the westward movement of the boom.

It was completely clear from the evidence that all three members of the crane operation, including the plaintiff, had been warned of the presence of the electric wires before they commenced the movement of the steel, and that they had also been warned of the fact that the electric lines carried a high voltage of electricity and were very dangerous. They had also been told not to cause the boom of the crane to be moved closer than six feet from the electric wires.

It was under these circumstances that this crew of three men commenced the movement of the steel. A steel cable ran up over the top end of the boom and down to a steel object characterized in the evidence as a "headache ball" or a "mammy headache ball." Two cables were attached to the lower part of this "headache ball" and extended downward so that they could be attached to the bundles of steel by the use of shackles and bolts at the ends of the cables. The plaintiff and his co-worker had the responsibility of fastening these shackles to the steel, one cable being fastened to each end. After the steel was so fastened, the crane operator would tighten the cable, thus causing the steel to be lifted from the ground. Then by turning the boom of the crane, the operator would move the steel to the east and place it on the ground where the plaintiff and his co-worker would unfasten the shackles. After this was done the operator would cause the boom of the crane to swing back to the west and when it reached the designated position the plaintiff would give the operator a hand signal to stop.

The crane operator testified that he was not entirely dependent upon the hand signals from the plaintiff to stop moving the boom when the designated position at the west end of the turn was reached, but that he could also fix this position by sighting objects in the area.

On the morning in question four or five bundles of steel were moved from the original location to the new position without mishap. On the last of these successful moves, after the steel was placed on the ground in the new location, the crane operator moved the boom back to the west and stopped it on a hand signal from the plaintiff. The plaintiff and his co-worker then proceeded to fasten their cables to another bundle of steel and when they had done so the crane operator began to raise the steel. It was then noticed that the steel was not level, the end which the co-worker had fastened being too high. The plaintiff signalled the crane

operator to let the steel back down so that the co-worker could properly fasten his end of the cable. During this time Smith had hold of the steel at his end. As the steel was being let back down, he suddenly noticed his co-worker spin around and appear to be thrown away from his end of the steel. The plaintiff shouted to the co-worker to find out what the trouble was and at that instant he stated that he felt his right hand and arm being clamped to the steel. From that point until he was on the ground he did not know what had happened to him.

The crane operator stated that he saw fire coming from the steel where Smith was holding it or from Smith himself and realized that Smith was being subjected to an electric charge. In order to get Smith away from the steel, the crane operator swung the boom of the crane to the east and Smith was thrown loose.

As a result of being subjected to the electrical charge the plaintiff was seriously and permanently injured. He suffered extensive burns at various points on his body and was required to be hospitalized for an extended period of time. As a result of his injuries, he has been rendered incapable of performing the work which he did at the time of his injury. As a result of her husband's injuries, the plaintiff Mary Smith has suffered loss of consortium and has in the past and will in the future be required to render care for her husband to a degree greatly in excess of that which was necessary before his injury.

At the conclusion of the plaintiff's case in the trial the defendants moved for a directed verdict on several grounds, the chief one being that the evidence clearly showed that the plaintiff's injuries were solely due to his own negligence. The court denied the motion. At the conclusion of all the evidence in the case the defendants again moved for a directed verdict on the same ground and the court denied it. The case was submitted to the jury under Florida standard jury instructions on the issues of negligence, contributory negligence (comparative), proximate cause, elements of damages, etc. After considerable deliberation the jury returned a verdict finding the defendants to have been negligent, and finding that the plaintiff was not negligent in any degree, and that he was entitled to recover damages in the amount of $410,000 and that his wife was entitled to recover damages in the amount of $90,000.

The principal argument made by counsel for the defendants with respect to the motion for new trial and the motion for judgment notwithstanding the verdict is that the evidence produced at the trial clearly shows either that Smith was guilty of negligence which was the sole proximate cause of his injuries or else that he was guilty of contributory negligence which required a reduction in

the amount of damages awarded the plaintiffs. Counsel for the defendants have submitted a memorandum in which they have cited several cases upon which they rely in support of said motions. The court has considered each of these cases. The case closest in point in fact is Commonwealth Trust Co. of Pittsburg v. Illinois Steel Co., 44 A 2d 594 (Supreme Court of Pennsylvania). That case is distinguishable from the one here for at least two reasons, to-wit: the Pennsylvania case involved a permanent, not a temporary, electric line, and secondly, in the case now before this court there was evidence that the boom of the crane had been placed in the same position on three or four previous occasions on the same morning without mishap.

In the opinion of the court there are several matters which must be taken into consideration in ruling upon said motions. First is the question as to whether the defendant Tampa Electric Company was guilty of negligence which was a proximate cause of the injuries suffered by Smith. It was and is the opinion of the court that this question must be answered in the affirmative. It is important that consideration be given to the fact that this was not a permanent electric line in a fixed location, but that it was a line temporarily placed in a location where Tampa Electric Company knew that construction was to take place. It is also important to consider that the wires on this line were carrying voltage in an amount exceedingly dangerous to human beings. There was also evidence before the jury that the Tampa Electric Company had reason to expect that cranes would be operated in the immediate vicinity of the electric lines, and it was aware that in the area where the plaintiff was injured the total width of the area between the bridge construction on the east and the temporary road on the west was about ninety feet and that the electric line was placed within this narrow area. There was also evidence in this case that the electric line in question could have been placed in another location further away from the construction site, and also that it would have been possible to have placed insulation of some kind on the electric lines or to have arranged to have shut off the electricity during the time the crane was working. It is the opinion of this court that under the principles of law set forth in the opinion of the District Court of Appeal, Second District, in Ahearn v. Florida Power and Light Company, 129 So.2d 457, the evidence as to the negligence of the Tampa Electric Company here was sufficient to submit that question to the jury.

The defendants contend, however, that even if the Tampa Electric Company was negligent in the location of its temporary line, such negligence was not the proximate cause of the injuries suffered by Smith, but that rather his negligence in signalling the

crane operator to stop in such close proximity to the electric line was the sole cause. This court concedes that there was evidence in the case, or reasonable inferences to be made, to justify such a conclusion, but it is also of the opinion that there was also evidence, or reasonable inferences to be drawn therefrom, that this was not necessarily so. First, there is no evidence whatever in the case that the boom of the crane ever came into actual contact with the electric line. Indeed, there is considerable evidence that on the last occasion when Smith signalled the crane operator to stop the boom, same was located no nearer than 4 feet from the wires and perhaps as much as 6 or 8 feet east of the wires. Secondly, there was uncontroverted evidence in the case that the boom of the crane would have had to have been within one-third to one-half an inch from the electric line for the electricity to have arced from the line to the boom. There is certainly no evidence in the case that Smith ever signalled the crane operator to move the boom west of the position where he last signalled it to be stopped. In fact, the evidence of the crane operator would indicate that this could not have happened because the brake had been set on the boom when it was last positioned. Thirdly, it is the opinion of this court that the jury was entitled to believe from the evidence that the last time Smith signalled the boom to be stopped, it was no closer to the wires than it had been on the other trips when the steel had been moved without mishap. If this was true, what was it that plaintiff had done which brought about his injuries? Certainly he was not injured during the other occasions when steel had been moved by the crane on the same morning. In addition, there was evidence before the jury that Smith had been instructed by his superiors to see that the boom of the crane should not be placed nearer than 6 feet from the electric wires and that he had followed said instruction. Fourthly, if the boom of the crane did not come close enough to the electric wires for electricity to have passed from the wires to the boom, then the electricity must have reached the cable in some other manner. There is no direct evidence to support this proposition. The question then arises as to whether there was any evidence before the jury from which any inference could arise with respect to this matter. It is clear that two cables were fastened to the steel, both of which were fastened to the "headache ball" on the crane. There is also evidence in the record that this "headache ball" was attched to  swivel which allowed it to turn freely. Thus it would appear that the cables running from the "headache ball" toward the ground could also turn freely. With this in mind, it is then to be remembered that when the load of steel was lifted just before the accident it was discovered that the end which had been fastened by the co-worker of Smith was up in the air too high, thus necessitating the steel

to be lowered so that the cable could be refastened on that end. This lowering was in process when the accident occurred. It seems to this court that it might well have been a matter of common knowledge to the jury that by reason of one end of the steel being improperly fastened, it was out of balance when it was raised and that this could have caused the cable, rather than the boom, to have come into contact with the wire. If such an inference could be raised from the evidence, then could it be said that Smith was guilty of any negligence in this happening? He had no control over the manner in which his co-worker fastened his end of the cable, nor would he have had any control over the cable turning because of the unbalance in the steel. Fifthly, if the boom itself came into contact with the electric wire, then it would appear that would have happened because the crane operator caused the boom to move to the west after it had been positioned by Smith. This too would have been something over which the plaintiff would have had no control.

Of course it can be argued that the plaintiff was negligent, even if the boom or the cable came into contact with the wire because of either of the matters above set forth which were beyond his control, because he did not observe this happening and did not turn loose of the steel he was holding. However, when it is considered that whatever did happen took place almost instantly, the jury might well have believed that he had no opportunity to do anything even if he did observe what was happening. Again, in the opinion of this court, this would have been a matter for the jury to determine.

If the evidence was such, and this court is of the opinion that it was, that the jury could properly have found therefrom that the defendant Tampa Electric Company was guilty of negligence in placing the electric wires where it did, and that such negligence was a proximate cause of the injuries to the plaintiff, then the burden was on the defendants to prove by the greater weight of the evidence that the plaintiff was guilty of contributory negligence which was also a proximate cause of his injuries. See: White v. Hughes, 190 So.446, Schwartz v. Priest, 14 So.2d 845, and C. W. Zaring & Co. v. Dennis, 19 So.2d 701.

Under the evidence in this case, the jury, in the opinion of this court, could properly find that the plaintiff was not guilty of any negligence proximately causing his injuries.

If the accident occurred as a result of the negligence of either the crane operator or of the co-worker, and the jury was of the opinion that the plaintiff was guilty of no negligence, then said jury, in the opinion of this court, would have been justified in

finding that such negligence of either the crane operator or the co-worker, or both, was concurrent with that of the defendant Tampa Electric Company. It is obvious that neither the crane operator nor the co-worker, or their employee, was a party defendant to this action and thus there was no way in which the jury could have found them guilty of negligence, but the concurring negligence of Tampa Electric Company, if determined by the jury, was sufficient to have warranted the verdicts against that defendant.

Lastly, this court is of the opinion that the damages awarded by the jury in its verdict were not so excessive as to require either the granting of a new trial or a remittitur. In addition to medical expenses, loss of earnings and impairment of wage earning capacity, the plaintiff John A. Smith will experience pain and suffering from his injuries sustained in this accident for the rest of his life. Likewise his wife will continue to suffer the results of her husband's accident for the remainder of her life. The amounts contained in the verdict were large, but not, in the opinion of this court, out of proportion to the damages suffered and to be suffered by the plaintiffs.

For the reasons hereinbefore set forth, it is ordered that the motion for new trial, motion for judgment notwithstanding verdict and motion for remittitur are each hereby denied.